IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ANTONIO HAWKINS, | ) |
|     Plaintiff, | ) Civil Action No. 7:20cv00675 |
| v. | ) **MEMORANDUM OPINION** |
| UNIT MANAGER STALLARD, | ) By:  Hon. Thomas T. Cullen |
|     Defendant. | )        United States District Judge |

_____

Antonio Hawkins, a Virginia inmate proceeding *pro se*, filed this action under 42 U.S.C. § 1983, alleging that the defendant, Unit Manager ("UM") Stallard, failed to protect him and retaliated against him while he was housed at Wallens Ridge State Prison ("Wallens Ridge"). The defendant filed a motion for summary judgment arguing that Hawkins failed to fully exhaust available administrative remedies before filing this action. After reviewing the evidence, the court finds that administrative remedies were not available to Hawkins through no fault of his own. Accordingly, the court will deny the defendant's motion.

I.

Hawkins arrived at Wallens Ridge in May 2019. He alleges that after he was assigned to a cell, his cellmate—a gang member—told Hawkins that he heard Hawkins had "'snitched' on one of his homies" at another facility. (*See* ECF No. 28, at 6.) Hawkins claims that he told his cellmate that the information was false and that the rumor had been started by an officer at the other facility. Hawkins states that, "for the next couple of days," his cellmate tried to convince Hawkins to drop a civil action against officers at the other facility because his lawsuit was "making the cell 'hot' (meaning that [he] was bringing officers resentment to [their] cell)."

(*Id.*)

Hawkins alleges that on June 14, 2019, his cellmate "became irate when [Hawkins] stepped into the cell" and said that Hawkins's "'bitch ass' was keeping him from getting a kitchen job." (*Id.* at 7.) Hawkins claims that his cellmate told him that UM Stallard offered to help the cellmate get a kitchen job if the cellmate could convince Hawkins to stop "'making trouble' with paperwork." (*Id.*) Hawkins states that his cellmate told him that if he stopped filing the lawsuit, he would help Hawkins get a job in the kitchen and would tell his "homies" that Hawkins did not snitch. (*Id.*) Hawkins claims that when he told his cellmate that he was "being a 'flunky' for Wallens Ridge staff," the cellmate slapped Hawkins in his face. (*Id.*) Hawkins told UM Stallard about the incident and UM Stallard allegedly said: "Well if you stopped causing people so much trouble then maybe you wouldn't have these problems." (*Id.* at 8.) Hawkins claims that he also told UM Stallard that his cellmate had a knife and a "hot water stinger"[1] in the cell, and that Hawkins was in danger. (ECF No. 39-4, at 2.) He claims that UM Stallard told him to "[s]top lying on those guys" at the other facility. (*Id.*) He also claims that UM Stallard "refused" to tell officers to check the cell for weapons. (ECF No. 39-4, at 2.)

Hawkins claims that his cellmate continued slapping him in his face and threatening him for the next six days. Hawkins alleges that when he informed UM Stallard that he was being assaulted, UM Stallard told him that he needed "to man up." (ECF No. 39-4, at 2.) He states that he was "scared to work or do any legal work." (ECF No. 28, at 7.) Hawkins alleges

---

[1] It appears that Hawkins is referring to an electric device that is used to boil water and other liquids.

that every time he tried to request any informal complaint or grievance forms, he was refused by officers who would say things like: "What [do] you want a grievance for[? S]o you can snitch again[?]" (*Id.* at 8.) Hawkins claims that the whole time he was in that housing unit, he was denied complaints and grievances.[2]

Hawkins alleges that on June 24, 2019, he awoke to find his cellmate "looking at [him] with an angry face." (*Id.*) Hawkins recalls that his cellmate started "blaming" Hawkins because he did not get the kitchen job that he wanted, and that he stated that he should have "killed [Hawkins'] 'snitching ass.'" (*Id.*) The cellmate allegedly told Hawkins that if Hawkins "did not check out of the cell, then he would kill [him]." (*Id.*) Hawkins claims that he informed UM Stallard about the threat and told Stallard that he feared for his life if Stallard did not authorize a cell change. UM Stallard allegedly told Hawkins that he had "made [his] bed, now [he has] to sleep in it." (*Id.* at 9.) Hawkins claims that UM Stallard refused to approve a cell change and asked him about the lawsuit he had filed against an officer at another facility. Hawkins states that another inmate volunteered to switch cells with Hawkins, but UM Stallard still refused to authorize the cell change.

The next morning, on June 25, 2019, at approximately 3:00 a.m., Hawkins's cellmate attacked him. Hawkins states that he felt a hand go around his neck and his cellmate attempted to pour boiling hair grease down his throat. Hawkins claims that when he resisted, the cellmate poured the boiling grease on his eyes and face. Hawkins states that he blacked out from pain and when he "came to" his cellmate was kicking him on the ground and officers at the door

---

[2] It appears Hawkins remained in that housing unit until June 25, 2019.

-3-

were telling them to stop fighting and spraying pepper spray. (*Id.*) Hawkins alleges that his cellmate eventually relented, and officers removed both of them from their cell. Hawkins states that his eyes were burning from the grease and he could not see anything. Thirty minutes after the attack, officials at the prison arranged for Hawkins to be transported to the Virginia Commonwealth University ("VCU") Medical Center in Richmond. Upon arrival at VCU, Hawkins was admitted to the burn care unit. Hawkins states that he stayed at VCU for a week where he underwent burn care treatment. He claims that he suffered burns to the whole upper half of his face, including his eyes.[3] He states that he could not see out of his left eye for a week, and he has "permanent scars on most of [his] face." (*Id.* at 10.)

On July 3, 2019, after being discharged from the VCU Medical Center, Hawking was taken to the Powhatan Medical Unit ("PMU") where he spent another week, receiving burn care. After a week, Hawkins was transferred to Sussex I State Prison ("Sussex I") on July 10, 2019, for further burn care appointments. After about a month at Sussex I, Hawkins was transferred back to Wallens Ridge on August 16, 2019. Hawkins states that he suffers permanent scars, emotional trauma, vision problems with his left eye, nightmares, night terrors, and depression. Hawkins argues that UM Stallard retaliated against him because he filed complaints against officers at another facility, and that UM Stallard failed to protect Hawkins from being attacked by his cellmate. Hawkins seeks $1.5 million in damages.

---

[3] Medical records confirm that Hawkins suffered second degree burns on his head, from his nose to his forehead. (*See* ECF No. 39-1, at 1–10.)

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World*

*Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.

### A.

UM Stallard argues that Hawkins failed to fully exhaust available administrative remedies before filing this action, as required by 42 U.S.C. § 1997e(a). The court finds that administrative remedies were not available to Hawkins through no fault of his own and, therefore, the court will deny the defendant's motion for summary judgment.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). A prisoner must exhaust all available administrative remedies, whether or not they meet federal standards or are plain, speedy, or effective, and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he second PLRA amendment made clear that exhaustion is now mandatory."). An inmate's failure to follow the required procedures of

-6-

the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

## B.

In support of the motion for summary judgment, UM Stallard provided an affidavit from Human Rights Advocate B. Ravizee; Virginia Department of Corrections' ("VDOC") Offender Grievance Procedure, Operating Procedure ("OP") 866.1; and Hawkins's grievance records related to the claims raised in this action. OP 866.1 details the grievance process by which offenders must resolve complaints, appeal administrative decisions, and challenge the substance of procedures. Human Rights Advocate Ravizee explains that the grievance process provides corrections staff a means to evaluate areas alleged policy violations and, if necessary, correct those problems in a timely manner. There is no dispute that the claims raised in this action are subject to the well-established requirements of OP 866.1.

Prior to submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to informally resolve his complaint. According to OP 866.1, this good-faith effort generally must be documented using an informal complaint. Once an inmate files an

informal complaint, it is logged in VACORIS, the VDOC's computer-based offender information management system, and a receipt is issued to the inmate. Within 15 days of receipt of the informal complaint, staff should respond to the informal complaint. If an inmate is not satisfied with the response to the informal complaint, he may file a regular grievance. If a response is not provided to the inmate within 15 days of the informal complaint being logged, the inmate may proceed to filing a regular grievance, and he must attach the receipt of the informal complaint to the grievance as documentation of his attempt to resolve the issue informally. The inmate is responsible for submitting the informal complaint in a timely manner to give staff time to respond within the period allowed to file a regular grievance.

A regular grievance generally must be filed within 30 days from the date of the incident. Regular grievances are date-stamped on the working day that they are received. If the grievance meets the criteria for acceptance, it is logged in VACORIS and receipt is issued to the inmate within two working days from the date the grievance is received. If the grievance does not meet the criteria for acceptance, the grievance is returned to the inmate within two working days of its receipt, along with an explanation for why the grievance was rejected at intake. Intake rejections can be appealed to the Regional Ombudsman. The Regional Ombudsman's review of the intake decision is the final level of review.

If a grievance is accepted at intake, it may proceed through up to three levels of review. Grievances must be appealed through all available levels of review to satisfy the requirement of exhaustion before filing a § 1983 lawsuit. Level I reviews are conducted by the Warden or Superintendent of the prison. If the inmate is dissatisfied with the determination, he may

appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services, or Superintendent for Education. For most issues, Level II is the final level of review. For those issues appealable to Level III, the Chief of Corrections Operations or Director of the VDOC conducts a review of the regular grievance. The time limit for issuing a Level I response is 30 days, 20 days for a Level II response, and 20 days for a Level III response. Expiration of the time limit (to include any authorized continuances) without issuance of a response at any stage of the process automatically qualifies the grievance for appeal.

## C.

Hawkins alleges that UM Stallard retaliated against him and failed to protect him on June 24 and 25, 2019. Hawkins did not timely file any regular grievances concerning these issues. But administrative remedies were not available to Hawkins, through no fault of his own. Accordingly, the court will deny the defendant's motion for summary judgment.

Hawkins filed three informal complaints and two regular grievances concerning the issues raised in this action. On July 18, 2019, Hawkins mailed two informal complaints (WRSP-19-INF-01919 and WRSP-19-INF-01921) to Wallens Ridge. The prison received these informal complaints on July 30, 2019. On an unspecified date, Hawkins mailed a third informal complaint (WRSP-19-INF-02016) to Wallens Ridge, which it received on August 13, 2019. These informal complaints were responded to in October and November, 2019.

On October 5, 2019, while housed at Wallens Ridge, Hawkins filed a regular grievance concerning the issues in this action. (*See* ECF No. 31-1, at 28-29.) This grievance was rejected

at intake as untimely filed. Hawkins did not appeal the intake decision.

On January 9, 2020, Hawkins filed a second regular grievance concerning the issues in this action. (*See* ECF No. 31-1, at 34-35.) This grievance was rejected at intake as untimely. Hawkins appealed but the Regional Ombudsman upheld the intake decision, and that decision was final.

It is clear from the record that Hawkins did not fully exhaust administrative remedies as to his claims. Hawkins did not submit a regular grievance that was accepted at intake, as required by the VDOC's well-established grievance process, OP 866.1. Therefore, the court considers whether administrative remedies were "available" to Hawkins.

In his verified responses to the defendant's motion, Hawkins explains how administrative remedies were not available to him. Hawkins was taken to the VCU Medical Center on June 25, 2019, the date of the attack, and he remained at the hospital until July 3, 2019. While he was at the hospital, Hawkins avers that in addition to being "incapacitated," he had no access to VDOC informal complaints or grievances. (*See* ECF No. 39, at 1 and 3.) The defendant does not submit any evidence to show that VDOC administrative remedies were available to Hawkins while he was at the hospital recovering from his burns.

Thereafter, on July 3, 2019, Hawkins was transferred to the PMU for further burn treatment, and he stayed there until July 10, 2019. Hawkins states that he remained "incapacitated" while he was at the PMU and that although he requested informal complaint and grievance forms, he was told that he "could not have them due to his medical status." (ECF No. 39, at 2 and 4.)

On July 10, 2019, Hawkins was transferred to Sussex I, where he stayed until August 16, 2019. Hawkins avers that after arriving at Sussex I on July 10th, he requested informal complaint forms, but he did not receive the forms until July 18, 2019. (*See* ECF No. 39, at 4.) Hawkins states that he completed the informal complaint forms the same day he received them, and he tried to submit them to a Sussex I officer. The officer refused to accept them and directed Hawkins to mail them to Wallens Ridge. Hawkins mailed two informal complaints (WRSP-19-INF-01919 and WRSP-19-INF-01921) to Wallens Ridge the same day, July 18, 2019. The next day, on July 19, 2019, Hawkins also mailed a letter and a request form to Wallens Ridge, explaining his lack of access to informal complaints and grievance forms since June 25, 2019, and requesting additional time to file grievances. Hawkins states that the Wallens Ridge grievance department did not respond. Hawkins claims that he mailed additional informal complaints and grievances on July 21 and 22, 2019. On July 30, 2019, Wallens Ridge received his informal complaints.

Hawkins did not receive any receipts or responses to his informal complaints or grievances before the deadline to file a grievance expired. Under OP 866.1(VI)(A)(2)(a), an inmate must attach documentation showing their attempt to informally resolve the issue to their regular grievance. (ECF No. 31-1, at 18.) VDOC policy provides that staff must respond to an inmate's informal complaint within 15 days. (*See* OP 866.1(V)(B) [ECF No. 31-1, at 17].) If 15 calendar days have passed and the inmate has not received a response, the inmate may submit a regular grievance on the issue and attach the informal complaint receipt as documentation of his attempt to resolve the issue informally. (*See* OP 866.1(V)(A)(3) [ECF

-11-

No. 31-1, at 17].)

In this case, there is no dispute that Hawkins was incapacitated and did not have access the VDOC's grievance process while he was hospitalized at VCU Medical Center from June 25 to July 3, 2019. There is also no dispute that Hawkins was incapacitated and could not obtain grievance forms, despite his requests for them, "due to his medical status" while he was housed at PMU from July 3 to 10, 2019. (ECF No. 39, at 2.) Finally, there is no dispute that, after Hawkins was transferred to Sussex I, it took eight days for him to obtain an informal complaint form, receiving that form on July 18, 2019. The undisputed evidence before the court is that Hawkins obtained the forms on July 18, 2019, and submitted them by mail to Wallens Ridge that same day. Wallens Ridge received the informal complaints on July 30, 2019. Under VDOC policy, Hawkins could not move on to filing a regular grievance until he received a response to his informal complaints or 15 days had passed without a response. Even if 15 days passed without a response, however, Hawkins would still need an informal complaint receipt to be able to proceed to a regular grievance. But Hawkins never received a receipt for his informal complaints. And responses to his informal complaints were not given to him until October and November 2019, long after his time to file a timely grievance had expired. Having reviewed the evidence as a whole and drawing all reasonable inferences in light most favorable to Hawkins, the court concludes that Hawkins was prevented from properly exhausting administrative remedies "through no fault of his own" and, thus, administrative remedies were not available to him. Accordingly, the defendant is not entitled to summary judgment based on Hawkins's alleged failure to exhaust.

## IV.

For the reasons stated, the court will deny the defendant's motion for summary judgment. The defendant shall have 30 days to file any motion for summary judgment addressing the merits of Hawkins' claims. If no motion is filed, the clerk will set this matter for a jury trial.

The clerk is directed to forward a copy of this memorandum opinion and accompanying order to the parties.

**ENTERED** this 10th day of February, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE